[Crim. No. 1316. Third Appellate District.—February 3, 1934.]

## THE PEOPLE, Respondent, v. K. NAKAMARU, Appellant.

K. D. Robinson for Appellant.

U. S. Webb, Attorney-General, and Jess Hession, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The defendant was convicted of murder of the first degree and sentenced to life imprisonment. He was charged with administering strychnine to his associate, Hanjiro Onishi. The case is based largely on circumstantial evidence. It is contended the verdict is not supported by the evidence and that the court erred in admitting certain declarations which were made by Onishi just before his death occurred.

The defendant and Onishi were Japanese. They had been acquainted for several years. For about six months they had been employed to work in the orchard on the farm of Louis Threlkel near Newcastle. They lived together in a one-room cabin situated a short distance from the dwelling-house of their employer. For two or three months they had been quarreling about a debt of $170 which was due from Onishi to the defendant. Half a dozen witnesses testified to frequent quarrels on the ranch and elsewhere. In conversations with other persons the defendant frequently criticised and cursed Onishi, complaining of his failure to pay the debt, of his eating more than a fair share of the provisions, of his manner of spraying the orchard and of various other faults. They had agreed upon the terms of a settlement of the debt, but Onishi lacked the funds with which to promptly pay it. He had attempted to borrow the money. The defendant was impatient and angry because of the delay. For several days he remained away from the ranch waiting about a Japanese boarding-house at Penryn for Onishi to bring him the money. He was in a rage and demanded an immediate settlement of the debt. On June 8, 1933, Onishi succeeded in borrowing $30 which he brought to the defendant at the boarding-house in Penryn and offered it to him in the form of a check. In anger, the defendant threw the check upon the floor, saying, "I don't want it." Onishi picked up the check and placed it in his pocket. The defendant violently seized Onishi, pulling him toward the kitchen and saying, "I want to chastise you." He cursed and repeatedly struck his victim. Mr. Goto, the proprietor of the rooming-house, and several other Japanese who were present, separated them. The defendant then rushed into the adjoining room and seizing an ice-pick, hastened back toward Onishi cursing and threatening him. He said, "I will get you." Advancing

toward him with the pick held aloft the defendant in anger said, "To get a fellow like Onishi is easier than getting a dog or cat". The defendant was, however, disarmed and prevented from making a further assault. Goto testified that he then said, "I am going to get him." Another Japanese by the name of Wega also testified that the defendant in a passion said: "I will kill him with iron bar. . . . I am going to crash Onishi's head with an iron bar."

At 8 o'clock on the following evening the defendant, in company with another companion, went in an automobile to the Threlkel ranch for the assumed purpose of procuring his personal belongings from the cabin. It appears to have been the custom of Onishi to prepare batter each night in the cabin for hotcakes which he fried for breakfast the following morning. The defendant knew of this practice on his part. The automobile was parked near the dwelling-house some distance from the cabin. The defendant and his companion went immediately to the cabin where they found Onishi. Mr. and Mrs. Threlkel and their two sons testified to a renewal of the quarrel between the defendant and Onishi at the ranch on that occasion. They overheard and recognized the angry voice of the defendant. After a few moments they observed Onishi and the defendant's companion coming down the pathway together from the cabin to the automobile. They were carrying the defendant's bedding and personal belongings. The defendant remained in or about the cabin for a few moments after the others left. The defendant was then seen following them down the pathway at a distance of 75 feet or more. Evidently the defendant did not remain in the cabin after the others had left for the purpose of securing other belongings, for he carried nothing away with him as he followed them to the machine. The defendant and his companion then drove away. The owners of the ranch overheard very little of the controversy which occurred on that occasion, as they left soon after the defendant's arrival to attend commencement exercises in town.

The following morning, June 10th, Mr. and Mrs. Threlkel were awakened at 5 o'clock by Onishi's hammering on their door. Upon inquiry he said: "I am very sick. . . . I can't go, my legs hurt." They opened the door and found him to be in great pain. He fell upon the grass a few

yards from their doorway and writhed in agony. He suffered violent convulsions. His teeth were firmly set. His body became rigid and arched. Over the objection of the defendant, Mrs. Threlkel was permitted to testify that Onishi, in the course of his convulsions, said "he had eaten the hotcakes; that they didn't taste good. I think so poisoned. Go get them, not let the cat and the dog eat them." Subsequently, Mr. Threlkel testified without objection that "he hollered 'Nakamaru, Nakamaru' twice the first spasm, and the next spasm he hollered 'Nakamaru' fierce like he was angry, three different times". Norwin, the son of Louis Threlkel, also testified, without objection, that he "heard him call Nakamaru's name several times, told me about the hotcakes being poisoned he thought, . . . called for a doctor". Another Japanese, by the name of Enkoji, who was also present at the time of the death of Onishi, testified without objection that he was writhing on the ground in great pain, and after "quite a bit of struggle" Onishi said "Nakamaru, s—— of a b——, came over here last night, and also the night before; (he said) I was going to die, and I want you (to) remember."

A doctor was promptly called, and arrived within about half an hour. In spite of every effort to save Onishi he died within a few moments in fearful convulsions. The doctor testified that he had all the symptoms of internal poisoning by strychnine. The cabin was immediately searched without finding any strychnine present. Six well-browned hotcakes were found in the frying-pan in the cabin. Evidently Onishi had used all the batter in cooking these six cakes. No additional batter was found. About one-third of one of the hotcakes had been consumed. The cakes were afterwards examined by the sheriff who found no evidence of the presence of poison crystals on the surface thereof. A can of baking-powder, a large can of flour and the pancakes were immediately taken from the cabin by the sheriff. An autopsy on the body of the deceased was performed. The contents of his stomach were subsequently analyzed and found to contain 1.6 grains of strychnine. A cross-section of the six pancakes was also examined and found to contain a similar amount of strychnine. Neither the flour nor the baking-powder contained strychnine. Expert medical evidence established without contradiction the

fact that the deceased died from strychnine poison. Since it was found in such abundance in the pancakes, of which the deceased had eaten about a third of one cake, there can be no reasonable doubt but that he was poisoned by means of strychnine which had been placed in the batter from which he made the cakes.

The defendant remained in or about the cabin the night of June 9th, after his companion and Onishi had left with his belongings, long enough to have placed the strychnine in the batter. The defendant admitted he was familiar with the custom of the deceased to mix the batter for the hotcakes the night before they were fried. This was done to permit the batter to raise by standing overnight. The defendant denied that he had ever purchased strychnine or that he knew what it looked like. Upon subsequent investigation the sheriff discovered he had previously bought strychnine at a drug-store in Newcastle three miles distant from the Threlkel ranch. A Sacramento druggist was called as a witness and testified that the defendant bought one-eighth of an ounce of strychnine from him February 16, 1932. It was delivered in an amber-colored bottle. The evidence of the druggist is competent. It was not too remote. It was in rebuttal of the defendant's denial that he had ever bought strychnine. The poison record of the drug-store was signed by the defendant, and he was identified by the druggist. The record indicates that he bought the poison for the avowed purpose of killing rats. In spite of this record and convincing evidence of the purchase of strychnine from the Sacramento druggist, the defendant persisted in denying that he ever bought it. He said: "I buy nothing, that poison, I never buy. (I) signed 'medicine'. I never (bought) that kind medicine. I never buy in all my life." It is true this particular strychnine was bought fourteen months before Onishi was poisoned. It is reasonable to assume the defendant did not originally purchase the strychnine to poison him. It is, however, not unreasonable to assume that a portion of the strychnine was retained in the bottle, and used by the defendant to poison the batter on the night of June 9th, after his enmity for Onishi arose. That was a matter for the determination of the jury. The defendant failed to account for his possession or subsequent disposition of the

strychnine after satisfactory evidence of its purchase had been adduced. That is evidence of guilty knowledge and a criminal motive.

The defendant's enmity toward Onishi; his threat to kill him; his knowledge of the custom of mixing the batter the night before it was used to fry the cakes; his visit to the cabin the night before the fatal poisoning occurred, and his remaining there long enough to have deposited the strychnine in the batter after the others had left; his denial of ever having purchased strychnine; the presence of strychnine in both the pancakes and the contents of the stomach of the deceased; the violent death of Onishi from the undisputed cause of strychnine poison and the accusation of Onishi in the very convulsions preceding his death that Nakamaru had poisoned him, furnish satisfactory evidence of the guilt of the defendant. We are, therefore, convinced the verdict and judgment are adequately supported by the evidence.

█ The declarations of Onishi were properly admitted in evidence as a part of the *res gestae*. (*People* v. *Wong Ah Foo*, 69 Cal. 180 [10 Pac. 375]; 13 R. C. L. 925, sec. 228.) The only statement to which an objection was made is that "he had eaten the hotcakes; that they didn't taste good. I think so poisoned. Go get them, not let the cat and the dog eat them". This statement does not purport to charge the defendant with poisoning the hotcakes. It merely asserts that he had eaten hotcakes and that he thought they were poisoned. It merely attempts to account for the excruciating pain with which he was then suffering and from which he died within a few moments. It does not purport to be a dying declaration. The fact that the hotcakes did contain poison was established by other evidence beyond controversy and without conflict.

█ The other statements which were made by the deceased immediately before his death occurred, and while he was suffering convulsions from the effect of the poison just before he expired, were competent as dying declarations. (*People* v. *Jones*, 130 Cal. App. 717, 720 [20 Pac. (2d) 713].) The foundation for the admission of these declarations was sufficiently proved. Moreover, they were admitted without objection. The deceased was writhing in pain and lived but a few moments. While he was in that condition Onishi

declared to his countryman Enkoji that he was going to die, and admonished him to remember what he said. He called the name of the defendant several times and said he had come over to the cabin the preceding night, and he thought the hotcakes had been poisoned.

We are of the opinion these statements were admissible as dying declarations. They were admitted without objection on the part of the defendant and he may, therefore, not complain of a lack of preliminary proof.

The judgment and the order are affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 17, 1934.